**STATE OF SOUTH DAKOTA, Appellant,**

v.

**Steven R. LONG et al., Appellees.**

**No. 71-1598.**

United States Court of Appeals,
Eighth Circuit.

Submitted March 13, 1972.

Decided Aug. 24, 1972.

Rehearings and Rehearings En Banc
Denied Oct. 2, 1972.

William J. Srstka, Jr., Asst. Atty. Gen., Pierre, S. D., for appellant.

Robert A. Warder, Rapid City, S. D., for appellees.

Before GIBSON,* HEANEY and ROSS, Circuit Judges.

ROSS, Circuit Judge.

The State of South Dakota has appealed from .a judgment entered by the United States district court, 336 F.Supp. 1360, granting writs of habeas corpus to Hale, Long and Tisdale on the grounds that their confessions were illegally obtained and because the State's attorney tape recorded a privileged communication between the three defendants and their counsel.[1] We affirm the judgment as to Long, but reverse as to Hale and Tisdale.

On March 11, 1968, the cabin of Forrest A. Koos, located in Spearfish Canyon near Spearfish, South Dakota, was broken into. A portable television and other personal property were taken. The next day, the sheriff of Lawrence County, Richard McGrath, investigated the break-in and observed tire tracks of a "compact car" together with footprints which appeared to be made by "football or track shoes" near the scene. Based upon another lead, the sheriff advised acquaintances in the canyon to be on the lookout for a red Volkswagen with Iowa plates, county number 77.

---

* Judge Gibson presided at the oral arguments and at the conference of the panel subsequent thereto. He did not participate in the written opinion.

1. Defendants' convictions were affirmed upon appeal to the South Dakota Supreme Court. State v..Long, 185 N.W.2d 472 (S.D.1971). '

The following day, March 13, Bell, a part-time deputy who ran a filling station near the canyon, called the sheriff and told him that he had just filled the gas tank of a red Volkswagen, with 77 county Iowa plates, that the car contained three youths, and that it was heading into the canyon. The sheriff radioed two of his deputies in the canyon to intercept the car and bring the boys into Spearfish so that he could talk to them. Long, Tisdale, and another youth named Johnson were in Long's Volkswagen when it was stopped. Long testified that after they were stopped, a deputy said, "We want to look in your car." When asked, "What for?", the deputy replied, "Because the sheriff wants us to search it." After the search, the three were told the sheriff wanted to talk to them, and they followed the deputies to the Spearfish Police Department. The car was again searched with Long's "consent," but the youths were not advised of their rights.

Because Long had to have his wrestling team picture taken at that time, the sheriff had deputy Palmer, who was in plainclothes, accompany him. The sheriff testified that he did not know why he failed to allow Long to go alone. Meanwhile, the sheriff accompanied Tisdale to the college, which all the defendants attended, and with Tisdale's permission, searched his dormitory room. No warnings were given Tisdale at that time, but no incriminating statements were made. Upon Long's return, with the deputy, from the picture taking session, the sheriff, with Long's permission, searched his room. In it he found a raincoat of the type taken from another cabin and some soccer shoes that had been wet. At that time the sheriff was certain Long was a "suspect." Then, the sheriff and deputy Palmer sat down with Long in his room and talked for thirty to forty-five minutes. The door was closed, although people kept opening it and looking in.

The sheriff used a fatherlike approach, and gained Long's friendship. As the sheriff acknowledged, he developed a "mutual trusting relationship" which continued throughout the remaining prearrest transactions. When Long decided to admit his part in the break-in, he was told by the sheriff that he did not have to say anything and that he had a right to an attorney. Deputy Palmer testified that the sheriff told Long, "You don't have to tell me a thing, and that anything you tell me I'd have to use against you." However, it is undisputed that the sheriff did not advise Long of his right to have an attorney appointed if indigent, or that he had a right to stop talking anytime he wished.

Long testified that he did not reveal the identity of the other individuals involved in the break-in at that first interrogation because he wanted to talk it over with them first. Long also testified that the sheriff told him: "We know a few things you don't think we know. We have a card up our sleeves." At the conclusion of the meeting, the sheriff told Long to bring the others involved, together with the stolen goods, to his office in Deadwood the following day. The sheriff and deputy Palmer then left.

All three defendants went to the sheriff's office the following afternoon, March 14, on their own volition, with the stolen TV and other articles. The sheriff did not advise them of their rights at this time. Long claims he asked the sheriff if they should call an attorney, but that the sheriff replied, "Boys, I just can't tell you." The sheriff could not remember saying that or whether Long asked the question. Long further claims it appeared to the three defendants that things would be worse for them if they refused to make the statements, and that it would be better for them if they threw themselves on the mercy of the sheriff and the court.

After talking to the defendants, the sheriff handed each of them a statement form, at the top of which was a list of their rights and an acknowledgment, which each defendant signed, that those rights had been explained to them. Be-

low this explanation of their rights and signature, the defendants wrote out their statements themselves as the sheriff had told them to do. The sheriff testified that he did not know whether they read the top of the forms or not. Long admitted that he read the rights listed at the top of the form, but claimed he did not understand the legal consequences of those warnings. Although the statements were signed at the top, after the warnings, they were not signed at the end. After writing out their statements, the three defendants returned to the college.

At the trial, Mr. Hoggatt, the State's attorney, examined the sheriff as to the contents of the statements. The court overruled objections thereto stating that the statements were being used only as memoranda to refresh the witness' recollection. The judge also found the statements to have been made by compulsion of conscience rather than any coercion on the part of sheriff McGrath. All three defendants testified and admitted their part in the burglary, but only after the sheriff had been permitted to testify concerning the confessions obtained from them.

## CUSTODIAL INTERROGATION

■ Prior to a determination of whether the warnings given were adequate, we must determine whether there existed a custodial interrogation as contemplated by Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L. Ed.2d 694 (1966). "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." The Court, in Miranda, did note that all the cases involved there shared a salient feature— "incommunicado interrogation of individuals in police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights." *Id.* at 445, 86 S.Ct. at 1612.

■■ The Supreme Court has held, of course, that a custodial situation need not be strictly limited to a police station. *See* Orozco v. Texas, 394 U.S. 324, 327, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (boarding house room); United States v. Phelps, 443 F.2d 246, 247 (5th Cir. 1971) (place of business). On the other hand, a general "on-the-scene" or other non-coercive questioning conducted in the course of routine investigation is not encompassed by *Miranda*. *See* Miranda v. Arizona, *supra*, 384 U.S. at 477, 86 S. Ct. 1602; United States v. Edwards, 444 F.2d 122, 123 (9th Cir. 1971); Utsler v. Erickson, 440 F.2d 140, 143 (8th Cir.), cert. denied, 404 U.S. 956, 92 S.Ct. 319, 30 L.Ed.2d 272 (1971); United States v. Tobin, 429 F.2d 1261, 1263 (8th Cir. 1970); United States v. Gibson, 392 F. 2d 373, 376 (4th Cir. 1968). With this in mind, we now examine the two occasions during which the damaging admissions were elicited.

### *Dormitory Room*

■ Long was the only one who made admissions at the dormitory; although Tisdale had been questioned, he admitted nothing at this time. The chain of events leading up to Long's admission in his dormitory room was as follows: Long's car was stopped and searched in the canyon. He was told that the sheriff wanted to talk to the occupants and that they were to follow the deputies to Spearfish. At the Spearfish Police Station, the car was again searched, this time by the sheriff. The sheriff had deputy Palmer remain with Long while he went to have his picture taken and then accompany him back to his room. Upon their return to the dormitory, the sheriff asked Long if he could search the room. The sheriff admitted that at least by the time he saw the raincoat and the shoes he felt Long was a "suspect." The sheriff and deputy Palmer then sat down with Long in his room, with the door closed, and talked. Thus, from the time they were stopped in the canyon until the admissions were made later in the room, Long was continuously

accompanied by or in the presence of the sheriff or one of his deputies or both. This certainly was a significant deprivation of Long's freedom of action. He could have reasonably believed that he was in custody, particularly when the sheriff insisted on a deputy accompanying him to have his picture taken.

Because of this custodial setting, Long should have been afforded a complete and meaningful statement of his constitutional rights. At most, Long was told he didn't have to say anything and that he could have a lawyer. This was a once-stated offering without further admonishment that he could stop talking at any time, that he had the right to have counsel present, and that he could have a court-appointed counsel if he could not afford to retain counsel

██ While it is true it is the substance of the warnings, not the form, that is important, Evans v. Swenson, 455 F.2d 291, 293 (8th Cir. 1972); Tucker v. United States, 375 F.2d 363, 369 (8th Cir.), cert. denied, 389 U.S. 888, 88 S.Ct. 128, 19 L.Ed.2d 189 (1967), the warnings given must be complete and meaningful to the accused. As stated by the Ninth Circuit, in Smith v. Rhay, 419 F.2d 160, 163 (1969), warnings are inadequate where the accused, although advised he had the right to an attorney, was not advised that "he had the right to the presence of an attorney and that, if he could not afford one, a lawyer could be appointed to represent him *prior to any questioning.*"

█ Whether an accused who is financially able to retain counsel must still be warned that he has the right to have counsel appointed, if he cannot afford to retain one, is not readily answered by a hard-and-fast rule.

"While a warning that the indigent may have counsel appointed need not be given to a person who is known to have an attorney or is known to have ample funds to secure one, the expedient of giving a warning is too simple and the rights involved too important to engage in *ex post facto* inquiries

into financial ability when there is any doubt at all on that score." Miranda v. Arizona, *supra*, 384 U.S. at 473 n.43, 86 S.Ct. at 1627.

Thus, the rule is that the warning must be given, but that an exception to that rule may be shown from the individual facts. *See e. g.*, United States v. Chaplin, 435 F.2d 320, 322 (2d Cir. 1970) (although pre-*Miranda* warnings); United States v. Fisher, 387 F.2d 165, 169 (2d Cir. 1967), cert. denied, 390 U.S. 953, 88 S.Ct. 1047, 19 L.Ed.2d 1146 (1968); United States v. Lubitsch, 266 F.Supp. 294, 297 (S.D.N.Y.1967).

█ In this case, the State argues that no prejudice resulted because the defendants were all able to retain counsel. But that is an *ex post facto* determination that does not justify the failure to advise the defendants of their rights if indigent. Here, Long, a college student, could not necessarily have been expected to have adequate funds for retention of counsel. More importantly, although we do not know his or his family's financial situation, Long may not at the time have known whether he was capable of retaining an attorney, or whether it was advantageous to try, especially since he was not fully apprised of the seriousness or consequences of the charge. We conclude, therefore, that the federal trial court was correct in its determination that the statement given by Long was the result of in-custody interrogation without adequate warnings as prescribed by *Miranda*, and that the admissions made by Long to the sheriff in his dormitory room should not have been received in evidence at the trial.

█ Because Long's dormitory statements are inadmissible, it would follow that his subsequent statements are suspect, whether or not proper warnings were given. Although subsequent statements are not automatically inadmissible, *cf*. Westover v. United States, 384 U.S. 436, 496, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966), if from the facts it is found that the two statements are so closely related as to taint the second,

and there were no intervening events sufficient to purge that taint, the second statement must also be inadmissible. *See* Evans v. United States, 375 F.2d 355, 361 (8th Cir. 1967); Gilpin v. United States, 415 F.2d 638, 642 (5th Cir. 1969); Harney v. United States, 407 F.2d 586, 590 (5th Cir. 1969). Long had "let the cat out of the bag," and in this case the statements were so closely related in time, we cannot say that intervening events were sufficient to purge the taint.

### Sheriff's Office

When the sheriff left the defendants' dormitory rooms, any custody there may have been terminated. Whatever psychological force compelled the defendants to go to the sheriff's office with the stolen articles the next day, was not the type of coercion contemplated in *Miranda*. Because the defendants arrived at the sheriff's office voluntarily, and, according to Long's testimony, were not guarded or told they could not leave, they were not in custody. Warnings required by *Miranda* are, of course, inapplicable to noncustodial interrogations. United States v. MacLeod, 436 F.2d 947, 950 (8th Cir.), cert. denied, 402 U.S. 907, 91 S.Ct. 1378, 28 L.Ed.2d 647 (1971); United States v. Hamlin, 432 F.2d 905, 908 (8th Cir. 1970). For this reason, we conclude that these statements were not elicited under constitutionally impermissible circumstances, and the sheriff was properly allowed to testify as to the confessions of Hale and Tisdale. Long's statement, however, was inadmissible for the reasons discussed above.

### TAPE RECORDER

During the cross-examination of the sheriff at the preliminary hearing, defense counsel stopped to confer with the three defendants. While in a "huddle," one of the defense counsel looked up and saw State's attorney Hoggatt holding the microphone from his tape recorder over across the counsel table and between two of the defendants. At that time, Mr. Dillavou, one of the defense counsel, brought this to the court's attention and made the following motion:

"MR. DILLAVOU: I move that recording be turned over to the Court. I have just had a very serious conversation concerning the charge with my client which went on to that tape recording.

\* \* \* \* \* \*

THE COURT: Turn it off and erase it.

MR. HOGGATT: I will testify to what I heard."

Later, defense counsel put Hoggatt on the stand and asked him if he had recorded any other conversations defense counsel had with the defendants. Before finally saying that he had not, Hoggatt avoided a direct answer. However, the recording was erased at the direction of the court and the incident was not mentioned in the actual trial of the case. In fact, the motion to erase the tape was the only motion raised by defense, as to this incident, during either the preliminary hearing or the trial.

This incident was raised on direct appeal to the South Dakota Supreme Court as a part of the argument that the defendants were denied a fair trial, but no mention was made of the issue in the court's opinion. State v. Long, 185 N. W.2d 472 (S.D.1971). At the hearing held in federal court, Mr. Hoggatt testified that he erased the tape prior to listening to the conversation again and that he made no use of the recording in any way in further proceedings in the case. This testimony was not refuted. However, the defendants argued and the federal district court held, that even absent a showing of prejudice, Hoggatt's actions deprived defendants the effective assistance of counsel guaranteed them by the sixth amendment.

Defendants likewise argue here that they need not affirmatively prove prejudice, citing Coplon v. United States, 89 U.S.App.D.C. 103, 191 F.2d 749, 758 (1951), cert. denied, 342 U.S. 926, 72 S.

Ct. 363, 96 L.Ed. 690 (1952), and that to do so would require them to disclose the privileged communication. We have examined *Coplon,* and the cases relied upon therein, and do not find them dispositive.

■ It is certainly true that where there is gross misconduct on the part of the Government, no prejudice need be shown. *See* Black v. United States, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966) (accused's hotel room was monitored during grand jury investigation); O'Brien v. United States, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967) (a listening device was planted in the business establishment of an acquaintance of accused after indictment); Caldwell v. United States, 92 U.S.App.D.C. 355, 205 F.2d 879, 881 (1953), and Coplon v. United States, *supra,* (interceptions of telephone conversations between accused and counsel before and during trial). However, those cases dealt with "surreptitious invasion" of the grossest kind by a government agent upon the confidential attorney-client relationship. United States v. Brown, 317 F.Supp. 531, 534–535 (E.D.La.1970).

■ The deliberate eavesdropping by Hoggatt in this case, although clearly reprehensible, did not, in our opinion, rise to the level of surreptitious intrusion condemned in those cases. Here the intrusion was made in open court in plain view of the judge, counsel and defendants. Moreover, it is apparent from the transcript of the hearing in federal district court that Hoggatt overheard the conversation while simply sitting at the counsel table. Defense counsel argued that they were conferring in a whisper and that it was unlikely they could have been overheard. However, Hoggatt was sitting in rather close proximity to the conversation, and testified that he overheard the conversation, aside from the taping. This is supported by the fact that when told by the court to erase the tape, Hoggatt stated that he would testify to what he had heard regardless.

It was admitted by Hoggatt that he did hear the very beginning of the conversation on tape when he was attempting to find the portion of tape to erase. Other than that, he testified that he erased the entire conversation without listening to it. Defense counsel testified that they were informed by the judge that the tape was erased in his presence. This would corroborate Hoggatt's claim that the tape was never used.

Because of the peculiar facts of this case, we find that no prejudice was shown. While we in no way condone the actions of the State's attorney, we cannot say there was a violation of defendants' sixth amendment right to effective assistance of counsel. Therefore, this incident could not have afforded a basis for granting the writs of habeas corpus.

The judgment is affirmed as to Long. The judgment as to Hale and Tisdale is reversed with directions to enter judgment dismissing their petitions.