**Edward Richard CLARK, Appellant,**

v.

**Frank W. WOOD, etc., Appellee.**

Nos. 86–5369, 86–5370.

United States Court of Appeals,
Eighth Circuit.

Submitted March 11, 1987.

Decided July 7, 1987.

Rehearing Denied Aug. 6, 1987.

Carol Grant, Minneapolis, Minn., for appellant.

Paul Kempainen, St. Paul, Minn., for appellee.

Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Edward Richard Clark appeals the district court's [1] denials of his petitions for writs of habeas corpus challenging his Minnesota convictions for first degree murder. We affirm.

Clark was convicted in 1974 for the first degree murder of Michael Jiminez and sentenced to life imprisonment. He was convicted in 1975 for the first degree murder of Michael's wife, Barbara, and sentenced to life imprisonment. A brief summary of the facts underlying his convictions follows.

## I. BACKGROUND

On the evening of April 21, 1974, Clark picked up the Jiminezes on Interstate 35/80 northwest of Des Moines, Iowa. The Jiminezes were hitchhiking from Kansas to Minnesota. Clark was driving from Cali-

---

[1]. The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota.

fornia, where he had been working, to Michigan, where his family resided.

Clark allegedly arrived in Michigan during the early morning hours of April 23. Later that morning Michael Jiminez' body was found partially concealed by railroad ties in Blue Earth County, Minnesota. He had died from a gunshot wound to the back of his head. A cardboard box containing a number of items belonging to the Jiminezes was found in a nearby state park. Several days later Barbara's naked body was found lying face down in Scotch Lake in Le Sueur County, Minnesota. The most probable cause of death was strangulation, but drowning could not be ruled out.

Found near Michael's body were a skull fragment, a matchbook from Lake Tahoe's Harrah's Casino Motel (where Clark had cashed checks two nights before he picked up the Jiminezes), two ball-point pens (with personalized lettering that was identical to the lettering on pens distributed by Clark's employer to all its employees), an empty .44 magnum cartridge (later determined to have been fired from the rifle found in Clark's possession), and tire tracks (with measurements consistent with the measurements of the tires on Clark's vehicle). Found near Barbara's body were a piece of pink cloth, which was believed to be used as a gag (and later was identified as the corner of a torn pink sheet found in Clark's possession), her shoe, and tire tracks (the measurements of which were consistent with the tires on Clark's vehicle).

In addition to items belonging to the Jiminezes, the cardboard box also contained a plastic cup (a box of plastic cups was later found in Clark's possession), a box of Medico pipe cleaners (similar pipe cleaners, a box of Medico filters, three pipes, and pipe tobacco were later found in Clark's possession), a sticker indicating protection by electronic alarm (identical stickers were found in Clark's vehicle and on its windows), a bingo coupon from Harrah's Casino Motel, and two receipts from California Business Machines with Clark's name on them (Clark had rented a typewriter from this shop shortly before he traveled to Michigan).

The authorities contacted the owner of California Business Machines, who later alerted the authorities when Clark returned to rent another typewriter. Clark was arrested and his vehicle impounded. Searches pursuant to warrants were made of his vehicle and of a storage shelter that he rented. These searches turned up the rifle, the torn pink sheet, the boxes of plastic cups and Medico pipe filters, pipe cleaners, pipes, tobacco, brochures from Harrah's Casino Motel, and the alarm system stickers.

Clark was returned to Minnesota and indicted on two counts of first degree murder. Because the bodies were found in two different counties, the crimes were tried separately.

Clark testified at the trial for the murder of Michael that he picked up a third hitchhiker who he allowed to drive while Clark slept. Clark explained that he awoke alone in his vehicle in the early morning hours of April 22 on a gravel road in rural Minnesota. After searching for the hitchhikers he threw out the cardboard box. Clark also maintained that in any event he was in Illinois when the murders occurred. A phone company official testified that a call was made to Clark's home in Michigan from a phone adjacent to the tollway in Belvidere, Illinois at 5:03 p.m. on April 22. Clark's wife testified that Clark made that call. The jury rejected Clark's version of what happened and found him guilty. He was sentenced to life imprisonment.

Although Clark did not testify at the trial for the murder of Barbara, part of his testimony from the trial for the murder of Michael was admitted into evidence. The phone company official also testified at the trial for the murder of Barbara. The jury found Clark guilty for the murder of Barbara and he was sentenced to life imprisonment.

Clark sought post-conviction relief in state court, challenging his convictions on numerous grounds. The relief was denied and the denials were affirmed by the Minnesota Supreme Court. *State v. Clark,* 296 N.W.2d 359 (Minn.1980) (*Clark I*); *State v. Clark,* 296 N.W.2d 372 (Minn.1980)

(*Clark II*). Clark then sought habeas corpus relief in federal district court. The district court accepted the magistrate's recommendations that Clark's petitions be denied, and the denials have been consolidated and are now before this court.

## II. DISCUSSION

Clark raises several contentions concerning the trial for the murder of Michael Jiminez (hereinafter referred to as the Blue Earth trial), several concerning the trial for the murder of Barbara Jiminez (hereinafter referred to as the Le Sueur trial), and several common to both trials. Our discussion is organized accordingly.

### A. Blue Earth Trial

Clark's first contention concerns juror impartiality. He contends that he was denied due process because he was convicted by a jury that was not impartial. Clark attributes the lack of impartiality to pretrial publicity, to an improper jury contact, and to some of the jurors seeing him in handcuffs.

Clark argues that because of the pretrial publicity it was impossible to impanel an impartial jury and he should have been granted a change of venue. Clark maintains that a series of newspaper articles reporting the murder as a "gangland-style" slaying, reporting that the authorities had narrowed their investigation from three suspects to one, and reporting that the authorities had arrested Clark for the murder prejudicially implicated him as the murderer. Clark claims that the prejudicial effect of the publicity is demonstrated by the fact that many of the prospective jurors had formed opinions about the case and that all the jurors ultimately seated had read or heard about the case.

To be sure, pretrial publicity may be so prejudicial as to require that a conviction be set aside. *See Sheppard v. Max-*

*well,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). But the publicity in this case did not rise to the prejudicial level of that in *Sheppard* and *Dowd.* Indeed, the coverage was widespread, but there are no allegations or indications in the record that the publicity was anything but accurate and objective. *See United States v. McNalley,* 485 F.2d 398, 403 (8th Cir.1973) (widespread or even adverse publicity not in itself enough grounds for change of venue), *cert. denied,* 415 U.S. 978, 94 S.Ct. 1566, 39 L.Ed.2d 874 (1974). Moreover, the existence of prejudice among prospective jurors, or that many of them have read or heard about the case, does not necessarily mean that an impartial jury cannot be impaneled. *Mastrian v. McManus,* 554 F.2d 813, 818 (8th Cir.), *cert. denied,* 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977). "It is not necessary that the jurors be totally ignorant of the facts and issues involved." *Id.* "The test is whether the prospective juror 'can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" *Id.* (quoting *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975)). The voir dire testimony in this case demonstrates that the jurors who were ultimately seated had not formed an opinion about the murder and that each could base his or her decision on the evidence presented. Therefore, the impartiality of the jury is fairly supported by the record, *see Patton v. Yount,* 467 U.S. 1025, 1031–32 n. 7, 104 S.Ct. 2885, 2889 n. 7, 581 L.Ed.2d 847 (1984), and Clark is not entitled to relief on this ground.

Clark also argues that he was denied due process because two anonymous phone calls were made to the home of one of the jurors. The juror reported the incident to the trial judge as soon as the court reconvened.[2] Clark maintains that he was

2. The trial court, in reporting the incident to counsel, summarized the two calls as follows: The juror's wife received a telephone call from a lady who said, "Is this Mrs. Graham?" I'm saying as much of what I remember of what Mr. Graham reported. "Yes, this is Mrs.

Graham." "Is your husband there?" "No, he's not." "Well, I'm one of the jurors," this lady said to Mrs. Graham.... She said, "You know, this is a very important case and the defense has a lot of friends around here." Mrs. Graham replied to the caller, "Yes, I'm

prejudiced because the juror was intimidated and because the judge failed to interview the jurors individually. We disagree. The record indicates as a matter of law that the contact was harmless. The contact was not coercive or threatening. The juror later testified that he decided to stay home that evening, contrary to previous plans, not because he was afraid but because he did not want to subject his children, who would be left at home, to the anonymous calls. Contrary to Clark's contention, therefore, the juror was not intimidated by the call. Clark was not prejudiced by the contact. Furthermore, the trial court did not abuse its discretion in deciding not to interview the other jurors. When the juror reported the incident to the judge, the juror indicated that he had not spoken to any of the other jurors about the calls. The judge informed all the jurors that they might receive anonymous calls and that they should report such incidents immediately. An interview of the other jurors would serve no purpose in these circumstances where the contact was neither threatening nor coercive, the contact had no apparent effect on the juror, and the juror assured the judge that he had not spoken to the other jurors.

■ Finally, with respect to juror impartiality, Clark argues that he was denied due process when some of the jurors saw him in handcuffs. Clark testified during post-conviction proceedings that jurors saw him in handcuffs on three occasions while in the corridor or in a conference room. We note that Clark's attorney did not witness these incidents nor did Clark tell him or the judge about them. Consequently, we question whether Clark can now complain about the matter. *See Estelle v. Williams*, 425 U.S. 501, 512–13, 96 S.Ct. 1691, 1696–97, 48 L.Ed.2d 126 (1976) (failure to object to being tried in prison garb is sufficient to negate constitutional violation). In any event, assuming he was seen in handcuffs, Clark has failed to demonstrate prejudice. He was not tried in handcuffs or handcuffed while in the courtroom. We have

said, in the context of a direct appeal, that "[i]t is a normal and regular as well as highly desirable and necessary practice to handcuff prisoners when they are being taken from one place to another, and the jury is aware of this." *United States v. Leach*, 429 F.2d 956, 962 (8th Cir.1970), *cert. denied*, 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 151 (1971). Accordingly, we hold that Clark is not entitled to relief on this ground.

Clark's second contention concerns the admissibility of three sets of statements allegedly obtained in violation of his Fifth and Sixth Amendment rights. Those statements are (1) his remarks to California authorities, made after he expressly requested an attorney, that he had not been in Minnesota for three years, and that his business partners must have "planted" the incriminating evidence; (2) his refusals to sign a waiver of his Fifth and Sixth Amendment rights and to discuss the murders; and (3) his statements made to Minnesota authorities.

■ The issue of admissibility of these statements was fully considered and thoroughly discussed by the Minnesota Supreme Court. *Clark I*, 296 N.W.2d at 365–67. With respect to the first set of statements the state court acknowledged that an issue existed as to whether the California authorities obtained the statements as a result of an "interrogation." Nevertheless, the court held that even if an interrogation took place, "there is no reasonable possibility that the admission into evidence of [Clark's] statements * * * contributed to his conviction and that the error was therefore harmless." *Id.* at 366 (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). We agree. While the statements are inconsistent with his alibi and therefore tend to impeach his veracity, it is unlikely that the jury rejected the alibi solely because of these statements. As the court noted, there is no credible evidence supporting the

---

sure my husband knows the importance and will so consider it." When Mr. Graham came home at 10:30, after he was home at 10:30, he got a phone call, very noncommittal and I

don't recall the words reported to me. He said, "Yes." Then he hung up.
Trial Transcript at 156–57.

alibi, which itself is inherently incredible. Moreover, the evidence of guilt, although circumstantial, is overwhelming. As the state court concluded:

> Defendant admittedly picked up the Jiminezes. He admittedly owned items found in the box with their discarded clothing and near Michael's body. Using an alias, he had rented a storage shelter, wherein the rifle that fired the cartridge that killed Michael and the pink sheet, a portion of which was used to gag Barbara, were found.

*Id.*

The state supreme court also held that any error concerning the second set of statements was harmless. We agree. The record not only demonstrates that defense counsel elicited the same information on cross-examination in an attempt to gain sympathy for Clark, but also that the testimony concerning the subject was stricken and the jury instructed to disregard it. The record supports a finding that no reasonable possibility exists that Clark's refusals contributed to his conviction.

Finally, we agree with the state court that the third set of statements was not admitted in violation of the dictates set forth in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Those statements were used to impeach Clark. *Miranda* does not preclude such use of the statements if they are voluntary and trustworthy. *Harris v. New York,* 401 U.S. 222, 224, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971). The record supports the state court's finding that Clark was not coerced. The evidence demonstrates that Clark clearly and carefully selected the topics he wanted to discuss with authorities and those that he did not want to discuss. We hold that the use of these statements did not amount to constitutional error. Ac-

cordingly, Clark is not entitled to relief on this ground.

Clark's final contention concerning the trial for the murder of Michael Jiminez is that he was denied effective assistance of counsel. Clark cites twelve instances in which he alleges counsel's performance is constitutionally deficient.[3] Both the magistrate and the district court held, however, that Clark failed to demonstrate that he was prejudiced by the alleged instances. We agree. As we said, the evidence of guilt is overwhelming. Clark has failed to show that but for these instances the outcome of the trial would have been different.

## B. The Le Sueur Trial

Clark's first contention concerns the admissibility of evidence. Admissibility rulings will support the issuance of the writ only when the alleged error infringes upon a specific constitutional protection or is so prejudicial that it amounts to a denial of due process. *Manning-El v. Wyrick,* 738 F.2d 321, 322 (8th Cir.), *cert. denied,* 469 U.S. 919, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984). Clark maintains that he was denied due process when the state was allowed to present evidence of Michael's murder and photographs of Barbara's body. He also maintains that his Fifth and Sixth Amendment rights were violated during the Le Sueur trial when portions of his testimony from the Blue Earth trial were admitted into evidence.

The record indicates that the state's case-in-chief at the Le Sueur trial included testimony from witnesses who described in detail the scene of Michael's murder. Photographs of Michael's body, including graphic and detailed pictures of the fatal wound to his head, were also admitted into evidence. Clark argues that this evidence was confusing and irrelevant to Barbara's murder.

---

**3.** Clark argues that he was denied effective assistance when his counsel failed to renew a motion for change of venue; made prejudicial remarks to the news media; allowed Clark to select the jury; failed to question the juror who received telephone calls about the case; failed to argue that statements were obtained involuntarily; acquiesced in the monitoring of conversations by Blue Earth County authorities; failed to present exculpatory evidence; failed to object to statements introduced into evidence which were made after invocation of petitioner's Miranda rights; failed to establish the identity of the tire tracks found at the crime scene; allowed waiver of petitioner's marital privilege; failed to object to prosecutorial misconduct; and failed to contest ballistics evidence.

The confusion, Clark argues, is demonstrated by a conversation between one of the jurors and the trial judge in which the juror expressed his frustration in understanding "the relevant relationship ... between a lot of this evidence." Clark also argues that the photos of Michael's head wound and body and the photos of Barbara's partially decomposed body were so gruesome that they served only to inflame the passion of the jury. Both arguments are unpersuasive.

■ The trial court properly admitted the evidence concerning Michael's murder. The evidence was relevant to show the circumstances or background of Barbara's murder. The circumstances of this case were such that neither charge of murder could be fairly presented to the juries without presenting evidence of the other. As the Minnesota Supreme Court stated, "[b]ut for the fortuity that the victims' bodies were found in separate counties, the prosecutions would have been simultaneous." *Clark I*, 296 N.W.2d at 369. We have often said that evidence of other criminal activity is admissible to show the context in which the crime occurred, that is, the *res gestae. See, e.g., United States v. Moore*, 735 F.2d 289, 292 (8th Cir.1984). "A jury is entitled to know the circumstances and background of a criminal charge. It cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." *United States v. Nicholson*, 815 F.2d 61, 63 (8th Cir.1987) (quoting *Moore, supra*). Any confusion the evidence may have caused was outweighed by this relevancy and certainly did not rise to the level of constitutional error. *See Manning-El*, 738 F.2d at 323 (to constitute a due process violation error must fatally infect the trial and deprive accused of fundamental fairness). Nor were the photographs so inflammatory that they fatally infected the trial. *See Kuntzelman v. Black*, 774 F.2d 291, 292 (8th Cir.1985) (admission of photos depicting victim and his organs at various stages of autopsy not constitutional error), *cert. denied*, — U.S. —, 106 S.Ct. 1474, 89 L.Ed.2d 729 (1986).

■ Unlike at the Blue Earth trial, Clark did not testify at the trial for the murder of Barbara. The trial court allowed the state, however, to present those portions of his Blue Earth testimony that were admissions. Clark was then allowed to present additional portions of the testimony that related to the admissions. The jury was allowed to hear the following portion of his prior testimony:

Q. (prosecutor) Did you ever give a description of a third hitchhiker to anybody?

A. (Clark) Just a—what I had observed of him, yes.

Q. And to whom did you give that?

A. To the investigator who come down on behalf of Mr. Adamson's office.

Q. Other than that, *you didn't tell anybody else or give anybody a description of that person.*

A. No. I didn't.

Q. And Mr. Adamson was who?

A. Mr. Adamson is the State Public Defender.

Clark argues that the above emphasized portion of the prosecutor's questioning constitutes a constitutionally impermissible comment that Clark invoked his Fifth and Sixth Amendment rights. *See Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1979). Without deciding whether an error exists, we hold that the alleged error, in any event, is harmless beyond a reasonable doubt. No reasonable possibility exists that the brief implicit reference to Clark's failure to describe the alleged third hitchhiker to authorities might have contributed to his conviction.

Clark next contends that he was denied due process when the prosecutor used inaccurate information to impeach his alibi witness. The telephone company official testified at both trials that a phone call was made from a phone adjacent to the tollway in Belvidere, Illinois to number 313–398–8443 (Clark's home number) in Royal Oaks, Michigan. The call was made at 5:03 p.m. on April 22. Clark maintained that he made the call and thus it would have been impossible for him to have been in Minneso-

ta between dark on April 22 and 3:00 a.m. on April 23, the times between which the pathologist estimated the murders occurred.

Because of a mistake by the court reporter at the Blue Earth trial, the transcript indicated that the number testified to was 313–398–8663. When the telephone company official testified to the correct number at the Le Sueur trial, the prosecutor, unaware that the discrepancy was due to clerical error, confronted the witness with the transcript and called the discrepancy to his attention in several questions. Clark maintains that his witness was discredited by this inaccurate information and that as a result he was denied due process.

The Minnesota Supreme Court held that the error was harmless beyond a reasonable doubt because (1) it was extremely unlikely the jury was impressed with the impeachment—it was given the actual telephone record and the witness adamantly insisted he was right, and (2) the telephone company official's testimony was equivocal—the state's "essential case" was that the murders occurred late April 21 or very early April 22, a possibility left open by the pathologist. Clark argues that the phone record could not have helped the jury because it was difficult to interpret. Clark also argues that although the pathologist testified that it was possible the murders could have occurred late on April 21 or early on April 22, he stated that it was unlikely.

■ We agree with the state supreme court that the improper impeachment was harmless. There is no reasonable possibility that the improper impeachment contributed to Clark's conviction. Even if the telephone records were difficult to interpret, the jury heard the witness insist that the discrepancy was a clerical error and explain that he testified from the same telephone record at each trial. Furthermore, no one, including the pathologist, knows for sure when the murders occurred. The time fixed by the pathologist is merely an estimation, which the jury may or may not accept as being precise.

Clark is not entitled to relief on this ground.

## C. Both trials

Clark contends that he was denied due process when he was cross-examined about an unrelated crime and when extrinsic evidence of the crime was presented during the Blue Earth trial. Clark was cross-examined about the ownership of the Ford Bronco he was driving at the time the murders occurred. The state was allowed to present extrinsic evidence to rebut Clark's denials that he stole the vehicle. Clark also contends that he was denied due process during the Le Sueur trial when the state presented evidence of these unrelated crimes.

The Minnesota Supreme Court held that the cross-examination was proper because the matter was opened on direct and involved specific instances of conduct bearing on credibility. The court held, however, that the admission of extrinsic evidence was error. Nevertheless, the court denied relief because the error was not so prejudicial as to deny Clark a fair trial, holding "the evidence of defendant's guilt is overwhelming." *Clark I,* 296 N.W.2d at 367–68. The state supreme court relied on the same reasoning in rejecting his claims with respect to the Le Sueur trial. *Clark II,* 296 N.W.2d at 374 n. 2.

■ To establish a denial of due process, Clark "must prove that the asserted error was so conspicuously prejudicial or of such magnitude that it fatally infected the trial and deprived him of fundamental fairness." *Manning-El v. Wyrick,* 738 F.2d at 323. Although our standard of review is different than that employed by the state supreme court, the state court's reasoning is persuasive here. The court reasoned that because Clark admitted he had been convicted of auto theft, any additional evidence that he stole the Ford Bronco could not have significantly altered the jury's perception of him. *Clark I,* 296 N.W.2d at 368. We agree. While the trial court might have erred in admitting the extrinsic evidence, the error was not of such magnitude that it fatally infected the trial. The

extrinsic evidence was merely cumulative on the point that Clark was an auto thief.

Clark also argues that the Minnesota Supreme Court erred when it relied on the above reasoning in rejecting his claim that it was error to allow his previous testimony on direct and cross-examination to be presented at the Le Sueur trial. The evidence that the Bronco was stolen was introduced during the Blue Earth trial as a result of Clark's denials on cross-examination. Thus it was governed by Minn.R. Evid. 608 (the equivalent of Fed.R.Evid. 608). During the Le Sueur trial, however, Clark's testimony was introduced during the state's case-in-chief. Therefore, he argues, the admission of the testimony was governed by Minn.R.Evid. 404(b) (the equivalent of Fed.R.Evid. 404(b)). Clark maintains that the state supreme court failed to recognize this distinction and therefore his claim was not fairly considered by the state courts. We disagree. Although the state court made no reference to the distinction, it cannot be said for sure that the court failed to consider it. In any event, Clark is not entitled to relief here because he has failed to demonstrate that the error, if any, rises to the level of constitutional dimension. Simply because the evidence was admitted in violation of Minn.R.Evid. 404(b) does not render it a due process violation. Clark has not shown that the error was so prejudicial or of such magnitude that it fatally infected the trial.

Clark contends that his Sixth Amendment right to counsel was violated when officials at the Blue Earth County Jail surreptitiously monitored his conversations with his attorney. Clark maintains that while he was being held at the jail officials either recorded or eavesdropped on his conversations with his attorney. The Minnesota Supreme Court found this claim to be without merit. The federal magistrate and the district court held that Clark was not entitled to relief on this claim because he failed to demonstrate that the alleged monitoring affected the trial. On appeal, Clark argues that he is not required to demonstrate that information gained as a result of the surreptitious monitoring was presented at trial. Rather, he need only demonstrate that his conversations were monitored. We disagree.

Indeed, the Sixth Amendment right to counsel means effective assistance of counsel. And we have said that effective assistance is denied if an accused is prevented from consulting privately with his attorney. *Mastrian v. McManus*, 554 F.2d at 821. But in *Mastrian* we also stated that absent proof that the substance of the conversation was of some benefit to the authorities, the claim must fail. *Id.* Here, Clark has failed to demonstrate that the information allegedly acquired by the jail officials was used by the state in some way. Clark relies on our decision in *South Dakota v. Long*, 465 F.2d 65, 72 (8th Cir. 1972), *cert. denied*, 409 U.S. 1130, 93 S.Ct. 951, 35 L.Ed.2d 263 (1973), however, in which we acknowledged that prejudice need not be shown in cases involving "surreptitious invasions of the grossest kind." In support of our statement in *Long*, we cited *O'Brien v. United States*, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967) and *Black v. United States*, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966). In both cases, the defendants' conversations with their attorneys were surreptitiously monitored by the government. In both cases, the defendants' convictions were set aside and new trials ordered. Since our decision in *Long*, however, the Supreme Court has explained its decisions in *O'Brien* and *Black*. In *Weatherford v. Bursey*, 429 U.S. 545, 551, 97 S.Ct. 837, 841, 51 L.Ed.2d 30 (1977), the Court stated that these decisions do not stand for the proposition "that whenever conversations with counsel are overheard the Sixth Amendment is violated and a new trial must be had." The Court explained, "[i]f anything is to be inferred from these two cases with respect to the right to counsel, it is that when conversations with counsel have been overheard, the constitutionality of the conviction depends on whether the overheard conversations produced, directly or indirectly, any evidence offered at trial." *Id.* at 552, 97 S.Ct. at 8420. Accordingly, we hold that assuming the alleged monitoring took place, and assuming that the monitoring constituted a Sixth Amendment violation, Clark is not entitled to relief because he has failed to

demonstrate that the substance of the overheard conversations were used against him. *See United States v. Morrison,* 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981) (when the prosecution has improperly obtained incriminating evidence the remedy is "to order a new trial if the evidence has been wrongfully admitted and the defendant convicted").

Clark next contends that his Fourth Amendment rights were violated by the admission at both trials of evidence that was obtained during an unlawful arrest and pursuant to a warrant issued without probable cause. Clark argues that the evidence seized during the search of his person, his storage shelter, and the Ford Bronco he was driving should have been suppressed. Federal habeas corpus relief, however, may not be granted on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial, unless the state did not afford the accused an opportunity for full and fair litigation of the Fourth Amendment claim. *Stone v. Powell,* 428 U.S. 465, 482, 96 S.Ct. 3037, 3046, 49 L.Ed.2d 1067 (1976). Clark was afforded such an opportunity. He was provided a pretrial hearing on the validity of the searches. The trial court held that the searches were valid and the Minnesota Supreme Court, after carefully considering Clark's claim, affirmed. *Clark I,* 296 N.W.2d at 369–70. Accordingly, we cannot review the merits of Clark's claim. Clark attempts to sidestep *Stone v. Powell* by arguing that the state supreme court did not fully and fairly consider this issue because it did not discuss one of his arguments. As Clark points out, however, the argument was presented to the state court. Clark is not entitled to relief merely because the state court chose not to discuss one of his arguments. *See Ryder v. Morris,* 752 F.2d 327, 330 (8th Cir.) ("we cannot say that the [opportunity for full and fair litigation] requirement is satisfied only in those cases in which a state appellate court has actually addressed the fourth amendment issues"), *cert. denied,* 471 U.S. 1126, 105 S.Ct. 2660, 86 L.Ed.2d 276 (1985). Because Clark was afforded an opportunity to fully and fairly litigate his Fourth Amendment claim, he is not entitled to federal habeas corpus relief on this ground.

Next, Clark contends that he was denied due process as a result of the state's failure to produce the following four items of exculpatory evidence: (1) the statement of Ed Newberg that he saw Clark in Michigan on April 21, 1974; (2) a memo from the fingerprint expert that latent fingerprints found on Clark's vehicle did not match the fingerprints of the two victims or Clark; (3) a statement by a service station owner in southern Minnesota that on an evening in late April he filled the tank of a Ford Bronco driven by a man fitting Clark's description, and that the man was alone; and (4) the statement of a gas station attendant in Iowa that he saw the victims alone at the M & M Cafe, which Clark argues would have corroborated the testimony of a waitress who testified for the defense that she served lunch to the victims, who were alone, on April 22. The Minnesota Supreme Court thoroughly considered each of these items of evidence under the dictates of *Brady v. Maryland* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) and concluded that none raises a reasonable doubt about Clark's guilt. *Clark I,* 296 N.W.2d at 370–71. After carefully reviewing the record, we agree and note that Clark's criticisms of the court's decision are unpersuasive. For the reasons given by the state supreme court, we hold that there is no "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985) (plurality opinion) [4]; *Reese v. Frey,* 801 F.2d 348, 351 (8th Cir.1986).

Finally, Clark contends that he was denied due process because of improper prosecutorial remarks during closing arguments in both trials. With respect to the closing argument in the Blue Earth trial,

---

**4.** A majority of the Supreme Court now appears to agree that the "reasonable probability" standard applies irrespective of the specificity of a request by defense counsel. In *Bagley,* Justice White's concurring opinion, joined by then Chief Justice Burger and Justice Rehnquist, ap-

Clark argues that it was improper for the prosecutor to express his personal opinion that Clark is guilty, to refer to Clark as a "master liar" and a "confirmed liar," to refer to matters outside the evidence ("many people say the evidence is 100% conclusive"), and to inflame the passions and prejudices of the jury by diverting the jury's attention from the actual evidence to the murder and possible rape of a "beautiful young woman," and by inviting the jurors to "look at the photographs and decide if she isn't a beautiful girl." With respect to the Le Sueur County closing argument, Clark argues that it was improper for the prosecutor to suggest that the jury should convict Clark because of the crime problem in general, to shift the burden of proof by suggesting that had Clark thought the state's medical evidence was rebuttable, he would have presented evidence to the contrary, to refer to Clark as a liar, and to express his personal opinions of the "fine quality" of law enforcement performed in this case and of his belief that one of the defense witnesses was mistaken.

■ Improper remarks made by the prosecutor during closing arguments will not support habeas relief unless the remarks "fatally infected the entire trial and deprived the petitioner of fundamental fairness." *Davis v. Wyrick*, 766 F.2d 1197, 1203 (8th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1209, 89 L.Ed.2d 322 (1986). We note, as did the state supreme court, that Clark failed to object to the prosecutors' remarks. *See Clark I*, 296 N.W.2d at 371; *Clark II*, 296 N.W.2d at 377. When a federal habeas petitioner's failure to object is treated by the state court as a procedural default of his claim, the failure is to be scrutinized by the federal court under the cause and prejudice standard, as opposed to the fundamental fairness standard. *See Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977). The Minnesota Supreme Court, however, did not reject Clark's claims *solely* on the ground that he failed to object. Although the state supreme court noted Clark's failure to object, it also addressed the merits

by stating that in light of the strong evidence of guilt, it is likely that the errors did not play a substantial role in influencing the jury to convict. *Clark I*, 296 N.W.2d at 371; *Clark II*, 296 N.W.2d at 377. In any event, whether we scrutinize his claim under the fundamental fairness standard or the cause and prejudice standard, we hold that Clark is not entitled to relief as a result of the prosecutors' remarks.

■ To be sure, the prosecutors' comments were improper. But they did not fatally infect the trials and deprive Clark of fundamental fairness. The evidence of guilt, as we have said, is overwhelming. Therefore, it is unlikely that the remarks affected the juries' ability to fairly judge the evidence. Alternatively, Clark has not shown cause for his failure to object to the improper remarks. The question of cause for procedural default does not turn on whether counsel erred or the kind of error counsel made. *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). Rather, cause must turn on some objective factors external to the defense that impeded counsel's efforts to object. *Id.* at 2646. Clark has not demonstrated any ground on which we could find cause for his failure to object. It should be noted that the Supreme Court in *Carrier* stated that ineffective assistance of counsel constitutes cause for a procedural default. But we have already rejected Clark's ineffective assistance claim with respect to his representation at the Blue Earth trial. And Clark does not make a similar claim with respect to the Le Sueur trial. Therefore, Clark is not entitled to relief as a result of the prosecutors' improper remarks during closing arguments.

## III. CONCLUSION

For the reasons stated above, we affirm the district court's decisions denying Clark's petitions for habeas corpus relief.

---

provingly quoted the "reasonable probability" standard of materiality set forth in Part III of Justice Blackmun's opinion in which Justice

O'Connor concurred. *United States v. Bagley*, 105 S.Ct. at 3385 (White, J., concurring).