**Jack Spencer EVANS, Petitioner,**

v.

**Russell ROGERSON, Warden, Iowa Medical Classification Center, Respondent.**

No. 4–98–CV–90369.

United States District Court,
S.D. Iowa,
Central Division.

Dec. 15, 1999.

Jack Spencer Evans, Oakdale, IA, Alfredo G Parrish, Parrish Krruidenier Moss Dunn & Montgomery LLP, Des Moines, IA, for Jack Spencer Evans.

Robert P Ewald, Attorney General of Iowa, Des Moines, IA, for Russell Rogerson.

## MEMORANDUM OPINION, RULINGS, AND ORDER GRANTING WRIT OF HABEAS CORPUS, AS AMENDED BY ORDER DATED DECEMBER 15, 1999

PRATT, District Judge.

Petitioner, Jack Spencer Evans ("Evans"), brings this habeas corpus petition, pursuant to 28 U.S.C. § 2254, challenging his custody after conviction for first degree murder. Evans's petition is based on five claims: 1) Fifth Amendment constitutional violations in obtaining incriminating statements; 2) ineffective assistance of trial counsel; 3) ineffective assistance of appellate counsel; 4) newly discovered evidence; and 5) insufficiency of the evidence. Because this Court finds that Evans's petition for writ of habeas corpus should be granted based on Fifth Amendment constitutional violations, his other claims are not addressed. The Fifth Amendment claims

are properly before this Court as Evans has exhausted his state court remedies. *See* 28 U.S.C. § 2254(b)(1)(A).

## I. Procedural History

On January 15, 1991, Evans was convicted of first degree murder in the Iowa District Court for Van Buren County and sentenced to life in prison. Evans appealed his conviction alleging violations of his Fifth and Sixth Amendment rights. The Iowa Court of Appeals reversed Evans's conviction on the grounds that his Sixth Amendment right to counsel was violated. The Iowa Supreme Court reinstated the District Court's conviction, finding that Evans's Sixth Amendment right to counsel had not attached. Evans subsequently filed an application for post-conviction relief. The District Court denied his application, the Iowa Court of Appeals affirmed the District Court, and the Iowa Supreme Court denied further review. On July 1, 1998, Evans filed this petition.

## II. Facts[1]

On September 11, 1990, eighty-one year old Della Forbes ("Forbes") was found dead in her rural home near Keosauqua, Iowa. She had been shot five times with .38 special bullets. Twenty-one year old Evans lived with his parents and brother, approximately one mile from Forbes's home. Evans is physically handicapped, graduated from high school in special education, and was not regularly employed. By canvassing local gun shops, law enforcement officials learned that Evans recently had purchased a .357 magnum, a gun which is capable of shooting .38 special bullets. On September 18, 1990, Agent Larry Hedlund ("Hedlund") of the Iowa Division of Criminal Investigation ("DCI") and Deputy Ron Parker of the Van Buren County Sheriff's Department ("the Sheriff's Department") visited the Evanses' residence. The officers interviewed Evans and his family and obtained his .357 magnum, which ballistics tests indicated was

---

1. The following facts are taken from the testimonial evidence presented at the suppression hearing and trial.

the murder weapon. During this visit, Hedlund determined that Evans most likely would be alone in the house the next day.

Around 11:30 A.M. the next day, September 19, 1990, Hedlund and another DCI Agent, Ronald Mower ("Mower"), returned to the Evanses' residence to interview Evans and execute a search warrant for the house and Evans's car. Evans was home alone, and he gave the agents permission to enter. Before beginning the interview, Hedlund read Evans his *Miranda* rights, and asked him if he understood those rights. Evans responded, "I think so." Mower then re-explained to Evans his *Miranda* rights and asked if he would sign a waiver form. Evans asked if signing the form would "get him into trouble" and Mower told him it would not. Evans signed the waiver form. Evans asked if he was under arrest and Hedlund said no.

The agents initially questioned Evans in the living room. Evans sat in a chair facing the television, which was on. After approximately thirty minutes of questioning Evans about his whereabouts, his gun, and what he thought should happen to the murderer, the agents told Evans his .357 magnum was the murder weapon and indicated he was a suspect in the case. At one point during this period of questioning, Hedlund moved his chair directly in front of the television and about one foot away from Evans because Evans was watching television and not responding to questions.

Near the end of the questioning Evans told the agents, "I know you don't believe me." and said he was scared. Shortly, thereafter, at 12:22 P.M., Evans told the agents he did not want to answer more questions. The agents ceased questioning. Mower told Evans they had a search warrant, and Mower began to explain the warrant to him. While Mower was explaining the warrant. Hedlund called the Sheriff's Department and was told that the warrant was defective and not to serve it. Mower left the Evanses' residence to obtain a new warrant. Hedlund remained at the resi-

dence, without a vehicle, to prevent destruction of evidence. Hedlund also kept a close eye on Evans out of concern for his own safety because he knew there were loaded firearms in the house. Hedlund did not explain to Evans why he stayed at the house or why he chaperoned Evans.

Evans and Hedlund watched television without speaking for at least thirty minutes. At around 1:00 P.M., Evans asked Hedlund if he could ask him some questions. Hedlund reminded Evans about his prior invocation of the right to remain silent and told him, "You've been advised of your rights." Evans then began to ask general questions about Hedlund's job and personal life, but avoided any conversation about the murder. At some point in the conversation, Evans asked if he could make a phone call. Hedlund replied affirmatively, Evans moved toward the phone, but then stopped and never did make a call. At another time, Evans made himself lunch and offered to make lunch for Hedlund. When Evans went outside to check the mailbox, Hedlund followed him. Twice, Evans went to the bathroom, and both times Hedlund told him to leave the door open. Later, Hedlund redirected the conversation with Evans to the murder investigation and asked Evans if he thought his parents would believe him. Hedlund asked Evans if he was sorry for what he did to Forbes. Evans said he was sorry. Evans became visibly upset and went outside. Hedlund followed. Evans told Hedlund he was scared of prison and asked what it would be like. Hedlund asked Evans if he was drunk or sober when he committed the murder. Evans stated "kind of both." Evans then told Hedlund he wanted to talk with an attorney, and Hedlund returned to the house.

Sometime during this conversation, at approximately 2:30 P.M., Mower and other law enforcement officials arrived at the residence and served Evans with the search warrant. Around 3:00 P.M., Van Buren County Sheriff Hugh Hardin ar-

rested Evans pursuant to an arrest warrant.

### III. Habeas Corpus Standard

■ The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this petition. Specifically, 28 U.S.C. § 2254(d)(2) applies to this case because the question before the Court is whether errors were committed by the Iowa courts in the determination of the facts as examined for violations of the Fifth Amendment. Title 28 U.S.C. § 2254(d)(2) states that an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment shall not be granted unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." This provision applies only to questions of fact, not to questions of law or mixed questions of law and fact. *See Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 887 (3d Cir.1999) (en banc).

### IV. Discussion

#### A. Unreasonable Determination of the Facts

"As several courts have recognized, the text of AEDPA offers little guidance to the courts charged with applying it." *Matteo,* 171 F.3d at 887 (citing *Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997)). Its standard of review provision is "far from self-explicating." *Id.* (quoting *O'Brien v. Dubois,* 145 F.3d 16, 20 (1st Cir.1998)). "Nevertheless, we must begin our analysis with the words of the statute."[2] *Id.* (citing *Bailey v. United States,* 516 U.S. 137, 144, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)).

■ Section 2254(d)(2) prohibits the grant of a writ of habeas corpus unless the adjudication of the claim resulted in a deci-

sion based on an unreasonable determination of the facts. Under § 2254(e)(1), however, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." The clear and convincing evidence standard is an intermediate standard that is more exacting than the preponderance of the evidence standard, but less demanding than the beyond a reasonable doubt standard. *See Cornell v. Nix,* 119 F.3d 1329, 1335 (8th Cir.1997).

If the petitioner presents "clear and convincing evidence" of error in the record, it is unclear whether the petitioner has thereby proved an "unreasonable determination of the facts" as required under (d)(2). This Court must determine whether (e)(1)'s clear and convincing standard is the standard by which to judge "unreasonable determination of the facts" in (d)(2).

■ In making this determination, this Court considers the following sources: (1) case law interpreting § 2254(d)(2); (2) case law interpreting § 2254(d)(1); (3) pre-AEDPA law; and (4) principles of statutory interpretation. First, this Court looks to the case law interpreting § 2254(d)(2). There is almost no case law interpreting "unreasonable determination of the facts" under (d)(2). However, the Ninth Circuit has stated that "a state court factual determination is unreasonable if it is 'so clearly incorrect that it would not be debatable among reasonable jurists.'" *Jeffries v. Wood,* 114 F.3d 1484, 1500 (9th Cir.1997) (quoting *Drinkard v. Johnson,* 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997), *overruled on other grounds by Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (holding AEDPA only applicable to cases filed after statute's enactment)), *cert. denied,* 522

---

2. This Court notes that "[p]rior to AEDPA's passage, a federal court's exercise of habeas corpus jurisdiction did not require that it pay any special heed to the underlying state court decision.... In contrast, the AEDPA amendments to section 2254 exalt the role that a

state court's decision plays in a habeas proceeding by specifically directing the habeas court to make the state court decision the cynosure of federal review." *O'Brien,* 145 F.3d at 20.

U.S. 1008, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997). For "more debatable factual determinations, 'the care with which the state court considered the subject' may be important." *Id.* (quoting *Lindh v. Murphy*, 96 F.3d 856, 871 (7th Cir.1996) (en banc), *rev'd on other grounds,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997)). This reasoning indicates a federal habeas court should not only review the state court's factual findings, but also analyze the thoroughness of its reasoning. Consequently, a state court's failure to address relevant evidence or factual issues, or its abbreviated analysis of a substantive issue, are factors to consider in determining the reasonableness of its factual determinations.

◼ Second, this Court examines case law interpreting section 2254(d)(1) because it contains similar language of "unreasonable application." This provision has been interpreted to mean that a state court's application of federal law is unreasonable if its "decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Matteo,* 171 F.3d at 889, *quoted in Long v. Humphrey,* 184 F.3d 758, 760 (8th Cir.1999). Importantly, "mere disagreement with the [trial] court's conclusions is not enough to warrant habeas relief." *Id.* These interpretations can be applied to subsection (d)(2): mere disagreement with a factual determination is not sufficient to meet the requirement of "unreasonable determination," and a federal court should not grant a writ under (d)(2) unless an objective review of the state court's factual findings and reasoning cannot reasonably be justified based on the evidence presented.

Third, pre-AEDPA law can inform this Court's analysis. Former § 2254(d)(8) put forth that a state court's finding of fact was presumed correct unless "the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record." The Eighth Circuit pointed out that "[a] federal court must more than simply disagree with a state court

before rejecting its factual determination. Rather, a federal court must conclude that a state court's findings lack 'even "fair support" in the record.' " *Woods v. Armontrout,* 787 F.2d 310, 313 (8th Cir. 1986) (quoting *Powell v. Wyrick,* 744 F.2d 632, 635 (8th Cir.1984)). The Eighth Circuit has also stated that "[f]ederal courts have an obligation to ascertain whether state courts found the relevant facts." *Fowler v. Jago,* 683 F.2d 983, 988 (6th Cir.1982). This suggests that federal habeas courts should review a state court's factual conclusions and reasoning, survey the applicable records for relevant evidence, and determine if the factual findings were fairly supported by the evidence.

◼ Fourth, this Court looks to the principle of statutory interpretation that a statute should be construed to effect all of its provisions. *See Freytag v. Commissioner of Internal Revenue,* 501 U.S. 868, 877, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991). Using the clear and convincing evidence standard of (e)(1) to define "unreasonable determination" in (d)(2) does not render either (e)(1) or (d)(2) superfluous. A sound interpretation is that proof by clear and convincing evidence of factual error satisfies (d)(2)'s "unreasonable determination of the facts" requirement. This interplay applies to situations where a state court's factual conclusion is contrary to clear and convincing evidence, where a state court fails to consider relevant evidence in resolving a factual dispute, and where a state court fails to address relevant factual issues in resolving an underlying substantive claim. Additionally, section (d)(2) makes clear that if a federal habeas court finds any fact to have been unreasonably determined by a state court, then the federal court must decide whether that same fact was a basis for the state court's determination of the underlying substantive claim. Thus, (d)(2) adds an element of causation between the factual error and the disposition of the substantive claim.

The tandem application of (e)(1) and (d)(2) also prevents the granting of a writ

merely because the federal court disagrees with the state court. In addition, this interpretation gives due respect to a state court's factual determinations and reasoning, defers to a state court's use of credibility and other intangibles necessary to resolving factual disputes, but does not immunize a state court's findings under the guise of a deference-in-theory, unreviewable-in-practice, standard. Applying another standard would cause confusion and uncertainty. A higher standard would effectively immunize a state court's factual findings from review, even if those factual determinations were clearly erroneous. Therefore, if a petitioner meets (e)(1)'s burden, the next step would be to decide whether factual errors were a basis for the state court's decision on the underlying substantive claim.

This framework and its reasoning supports the general principle that a state court's findings should not be disturbed unless they are unreliable. *See Fowler,* 683 F.2d at 988 (stating that § 2254(d) "clearly points up the need for federal courts to know that state court findings are reliable."). Unreliability stems from failure to address relevant evidence, unsupported factual findings, or inappropriately abbreviated analysis of a substantive issue and its related evidence.

Through an examination of Evans's Fifth Amendment claims, this Court will decide whether the Iowa courts' Fifth Amendment decisions were "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2).

## B. Substantive Claims—Fifth Amendment

■ Evans claims that on September 19, 1990, Hedlund and Mower obtained incriminating statements from him in violation of *Miranda* and without a valid waiver, and that subsequently those statements were used at his trial in violation of the Fifth Amendment to the United States Constitution. If Evans was not in custody, then he was not entitled to the protections

of *Miranda.* *See Edwards v. Arizona,* 451 U.S. 477, 486, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Therefore, this Court will first examine whether the Iowa District Court's and the Iowa Supreme Court's conclusions that Evans was not in custody were based on an unreasonable determination of the facts.

### 1. Custody

■ A person is not generally considered to be in custody unless he is under arrest or subject to a restraint on freedom of movement to a degree associated with a formal arrest. *See Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). The Eighth Circuit has listed six factors to use in determining custody:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of questioning.

*United States v. Griffin,* 922 F.2d 1343, 1349 (8th Cir.1990). The first three factors are considered mitigating because they tend to counsel against custody. *See id.* The last three factors are coercive since they usually support custody. *See id.* The six factors do not comprise an exhaustive list, but are deemed very influential to the custodial issue. *See id.*

The first factor, if met, is the most obvious and effective means of demonstrating that a suspect has not been taken into custody or otherwise deprived of his freedom. *See id.* (quoting *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602). Informing a sus-

pect that he is not under arrest and that he may terminate the interview at will usually will not result in a finding of custody. *See id.*

The second factor focuses on any restraint on a suspect's freedom of movement during questioning. While suspects are often escorted or chaperoned during questioning for reasons unrelated to custody such as concern for officer safety, the relevant inquiry is the effect on the suspect. *See id.* at 1350 (quoting *United States v. Carter,* 884 F.2d 368, 372 (8th Cir.1989)). While physical restraint alone does not invoke *Miranda,* it is understood that the likely effect of being placed under close watch during questioning, or being told to remain in sight of agents, is to associate those restraints with formal arrest. *See id.* at 1350–51 (quoting *Wilson v. Coon,* 808 F.2d 688, 689 (8th Cir.1987)).

The third factor looks at who initiated the interview. When the interview is instigated at the direction of law enforcement, as opposed to the suspect, custody is more likely to be found. *See id.* at 1351. The fourth factor concentrates on the tactics utilized by law enforcement officials during the interrogation. The *Miranda* opinion summarized the type of strong-arm and deceptive tactics of which it disapproved:

> To be alone with the subject is essential to prevent distraction and to deprive him of any outside support. The aura of confidence in his guilt undermines his will to resist. He merely confirms the preconceived story the police seek to have him describe. Patience and perseverance, at times relentless questioning, are employed. To obtain a confession, the interrogator must "patiently maneuver himself or his quarry into a position from which the desired objective may be attained." When normal procedures fail to produce the needed result, the police may resort to deceptive stratagems such as giving false legal advice. It is important to keep the sub-

ject off balance, for example, by trading on his insecurity about himself or his surroundings. The police then persuade, trick, or cajole him out of exercising his constitutional rights.

*Miranda,* 384 U.S. at 455, 86 S.Ct. 1602 (footnote omitted). Custody may still be found though no strong-arm tactics are used, but the absence of such tactics is a factor which can assist in resolving a custody issue. *See Griffin,* 922 F.2d at 1351.

The fifth factor scrutinizes the atmosphere of the interrogation. If the atmosphere is dominated by law enforcement, it is more likely the interview will be considered custodial. *See id.* at 1351–52. Some considerations in determining whether the atmosphere is dominated by police are whether the police assume control of the interrogation site, dictate the course of conduct followed by the suspect, and whether other persons are present at the scene. *See id.* at 1352 (quoting *United States v. Jones,* 630 F.2d 613, 616 (8th Cir.1980)). Removing the suspect from the presence of family or friends who might lend moral support during questioning and deter a suspect from making inculpatory statements is considered a recurring example of police domination. *See id.* The sixth factor, actual arrest after questioning, is not discussed by the *Griffin* Court, but is self-explanatory.

Application of these factors requires a finding that Evans was in custody. The analysis includes examination of relevant evidence and factual issues that the Iowa courts either did not consider or mention when deciding the custody issue. The evidence presented by Evans consists of testimony from Hedlund and Mower at the suppression hearing and at trial. The record demonstrates the agents' testimony was viewed by the Iowa courts as more credible than Evans's, especially since much of the agents' testimony was memorialized in reports. Also, with one exception,[3] the testimony given by Evans and the agents is consistent regarding the facts

---

**3.** Conflicting evidence exists as to whether

Hedlund told Evans he had to waive his Mi-

relevant to the Fifth Amendment issues. Therefore, the agents' testimony is a proper source of facts as to what transpired on September 19, 1990, and that testimony qualifies as clear and convincing evidence under (e)(1).

The relevant evidence includes the following: (1) when Hedlund and Mower went to initiate the interview with Evans on September 19, 1990, they knew he would be home alone;[4] (2) after Evans was initially read his *Miranda* rights, he asked Hedlund and Mower if he was going to be arrested and was told he was not;[5] (3) Evans asked the agents if signing the waiver form would get him into trouble and they said no;[6] (4) Hedlund questioned Evans from a foot away at one point when Evans was unresponsive and watching television;[7] (5) Evans was told his gun was the murder weapon and that he was a suspect;[8] (6) when Evans told the agents he did not want to answer any more questions, he also said he was scared and that he knew the agents did not believe him;[9] (7) when Mower left, Hedlund stayed to assure no evidence tampering or destruction, but never told Evans this was why he stayed;[10] (8) after Evans reinitiated the

conversation with Hedlund, he asked Hedlund questions only about his personal life and job;[11] (9) during this period of conversation, Evans asked Hedlund permission to use the phone in his own home, but never did make a phone call;[12] (10) also during this period Evans went outside to check the mail and Hedlund followed;[13] (12) Evans twice went to the bathroom and Hedlund made him keep the bathroom door open so he could observe him;[14] (13) Hedlund chaperoned Evans because of personal safety concerns but never told this reasoning to Evans;[15] (14) when Mower returned and served the new search warrant at 2:35 P.M., several law enforcement officers accompanied him;[16] (15) around this time. Hedlund told Evans that it was remarkable what he could do despite his handicaps;[17] (16) Evans asked Hedlund if he had ever been shot at in the line of duty and Hedlund responded that the question was quite ironic;[18] (17) Hedlund told Evans that it was time for him to be a man and take responsibility for what he did;[19] (18) shortly after this, Hedlund asked Evans if he was sorry for what he did to Forbes and Evans said he was sorry;[20] (19) immediately Evans be-

randa rights before Hedlund could talk with him the second time, that is, after Evans had invoked his right to remain silent and then reinitiated the conversation. This conflict is discussed *infra*.

4. Hedlund, Suppression Hearing ("SH"), p. 29 ll. 19–25; p. 30 ll. 1–4; Mower, SH, p. 58 line 25; p. 59 ll. 1–2; Hedlund, Trial, p. 415 ll. 16–24.

5. Mower, SH, p. 51 ll. 11–12; p. 58 ll. 13–16.

6. Hedlund, SH, p. 24 ll. 18–25; Mower, SH, p. 45 ll. 20–25; Hedlund, Trial, p. 388, ll. 12–17.

7. Hedlund, SH, p. 35 ll. 8–25; p. 36 ll. 1–3.

8. Hedlund, Trial, p. 395 ll. 10–20; Mower, Trial, 11–14.

9. Mower, SH, p. 57 ll. 18–25, p. 58 line 1; Hedlund, Trial, p. 399 ll. 6–8; p. 415 ll. 8–15.

10. Hedlund, SH, p. 32 ll. 13–19; Hedlund, Trial, p. 401 ll. 7–9; p. 417 ll. 18–25.

11. Hedlund, SH, p. 13 ll. 21–24; Hedlund, Trial, p. 404 ll. 7–10.

12. Hedlund, SH, p. 33 ll. 6–9.

13. Hedlund, SH, pp. 16–17 line 18.

14. Hedlund, SH, p. 15 ll. 22–25; p. 16 ll. 1–4, 18–25; p. 17 line 1; Hedlund, Trial, p. 428, ll. 14–17.

15. Hedlund, SH, p. 16 ll. 9–12; p. 17 ll. 3–8.

16. Hedlund, SH, p. 18, line 25; p. 19 ll. 1–4, 12–25; p. 33 ll. 22–25; p. 34 ll. 1–9; p. 42 line 10–12;

17. Hedlund, SH, p. 14 ll. 8–14.

18. Hedlund, SH, p. 402 ll. 21–25.

19. Hedlund, SH, p. 33 ll. 10–18; Hedlund, Trial, p. 416 ll. 20–25.

20. Hedlund, SH, p. 28 ll. 1–7; p. 33 ll. 15–16; Trial, p. 404 ll. 17–19, 25; p. 405 ll. 1, 5.

came visibly upset and went outside and Hedlund followed;[21] (20) Evans told Hedlund that he was afraid of prison, scared for his personal safety, and asked Hedlund what prison would be like;[22] and (21) Hedlund asked Evans if he was drunk or sober when he had done this to Forbes.[23]

Also relevant are the following facts.[24] Evans suffered two strokes as a child that affected him mentally and physically. He attended special education classes in high school, but was able to drive a car, hunt, and even had a license to carry a handgun. Evans was required to wear special shoes and socks, and sometimes use a cane, to walk. He also received medical treatment regularly for a red-blood disorder called polycythemia vera, which affected him physically.

Relevant to the first *Griffin* factor, the agents initially read Evans his Miranda rights. Later, Evans asked if he was under arrest and was told he was not. While this factor favors noncustody, it is not dispositive since other circumstances can outweigh it. *See South Dakota v. Long,* 465 F.2d 65, 68 (8th Cir.1972) (finding other circumstances strongly outweighed the police statement of, "You don't have to tell me a thing, and that anything you tell me I'd have to use against you.").

As to the second factor, Hedlund chaperoned Evans outside when Evans went to check the mail, and told Evans to keep the bathroom door open when Evans went to the bathroom. *See United States v. Carter,* 884 F.2d 368, 372 (8th Cir.1989) (finding fact that agents told defendant to "just stay here" indicative of custody). While these were wise actions by Hedlund because of a legitimate concern for his own safety, those reasons were not relayed to Evans. This is important because the focus is whether Evans reasonably believed that he was free to do as he pleased. *See*

*Griffin,* 922 F.2d at 1354 (emphasizing that officer . escorted defendant throughout apartment but officer's safety concerns were not disclosed to defendant). Additionally, it is telling that Evans asked Hedlund permission to use his own telephone. While Evans's subjective state of mind is not dispositive, such a question does give insight into the effect on Evans. *See id.* ("[W]e find that appellant could not reasonably have understood that he was free to do as he pleased when he was not permitted to go to another room of his own home without being accompanied by an a(sic) officer."). This factor strongly favors a finding of custody.

Pertinent to the third factor, the agents drove to the Evanses' house and initiated the interview by asking Evans to agree to questioning. *See United States v. Mottl,* 946 F.2d 1366, 1370 (8th Cir.1991) ("[The agent] initiated contact by asking Mottl to agree to questioning, a factor which weighs in favor of finding custody under *Griffin.*"). This factor also favors a finding of custody.

Turning to the fourth factor, there is an indication of questionable techniques used by the agents. The agents gave Evans misleading legal advice when they advised him that he would not get into trouble by signing the waiver form. Hedlund turned the discussion back to the topic of Forbes's murder after Evans resumed conversation with him, even though Evans was talking solely about Hedlund's work and personal life. Hedlund also stated the following: it was remarkable what Evans could do despite his handicap; it was ironic that Evans asked him about being shot; and that Evans should act like a man and take responsibility for what he did. These techniques and comments are of the kind discouraged in *Miranda. See Miranda,*

21. Hedlund, Trial, p. 405 ll. 7–12.

22. Hedlund, Trial, p. 405 ll. 13–25; p. 406 ll. 1–9.

23. Hedlund, SH, p. 28 ll. 8–10; Trial, p. 407 lines 1–9.

24. *See* Azalee Evans, Trial, pp. 528–33; Evans, Trial, p. 660 ll. 21–25; p. 661 line 1; p. 665 ll. 11–25; p. 666 ll. 1–4; p. 731 ll. 6–25; p. 732 ll. 1–4.

384 U.S. at 450, 86 S.Ct. 1602. While improper, these tactics are not the type of egregious acts normally characterized as strong-armed or deceptive. However, the Court does "not expect to find these [strong-arm and deceptive] tactics employed in every case, particularly when authority dictates that they should not be employed in any case." *Griffin*, 922 F.2d at 1354. Thus, the absence of those tactics does not necessarily preclude a finding of custody. *See id.* The Court finds that even though this factor has not been met, its absence does not favor noncustody since the agents' tactics were questionable.

The facts evidence a satisfaction of the fifth factor, police-dominated atmosphere. While the fact the agents chose their interview site at Evans's own home[25] generally counsels against a finding of custody, this is not always the case. *See Griffin*, 922 F.2d at 1355 n. 15 ("It is the accepted logic that an interrogation in familiar surroundings such as one's own home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody. Nonetheless, it is not difficult to envision that a suspect's sense of captivity can actually be intensified by the intrusive and intimidating environment created when agents of the law take control of a person's private residence. After all, a person can not reasonably expect to be free anywhere if not within the refuge of his home.") (citation omitted). It is important that the concept of "home" not sweep away all custodial factors surrounding the agents' presence. *See Evans*, 495 N.W.2d at 766 (Snell, J., dissenting). While the bare facts that Evans made himself lunch, offered Hedlund food, and checked his mail counsel against police domination, there are other facts to be considered.

Countering the "home field advantage" was the fact that the agents selected a time to interview Evans when they knew

he would be alone.[26] Though the agents did not affirmatively remove Evans or others from the house to create the atmosphere, the fact remains that Evans was secluded from others who may have provided moral support. *See Long*, 465 F.2d at 68 (finding important that defendant was alone in his dormitory room with a sheriff and deputy, even though "people kept opening [the door] and looking in").

Also, at one point in the interview, when Mower was still present, Hedlund moved his chair only one foot away from, and directly in front of, Evans because Evans was unresponsive to questions. Such conduct reasonably could lead Evans to believe that he must answer questions, the agents were in control, and he was not allowed to do as he pleased in his own home. Other important evidence is the reading of *Miranda* rights, the signing of the waiver form, the statements that Evans was a suspect and that his gun was the murder weapon, the agents' initial attempt to serve the search warrant, Mower leaving Hedlund at the house without a vehicle, Hedlund chaperoning Evans wherever he went, and Mower's return with other officers to serve the search warrant. These facts and circumstances demonstrate that the agents were in control. In addition, Evans told the agents he was scared, asked if he would get into trouble by signing the waiver form, if he was under arrest, if he was a suspect, and if he could use his own telephone. These statements evidence that Evans believed the agents were in control of the situation, a reasonable belief in light of the overall facts. This factor strongly favors a finding of custody.

The sixth and final *Griffin* factor asks whether the suspect was arrested after the interview. Evans was arrested by Sheriff Hugh Hardin after the interrogation with

---

25. It should be noted that Evans lived at his parents' house along with his younger brother. For a discussion of in-home police questioning in the context of this case, see Wendy L. Elston, *State v. Evans: A Person's Home— Castle or Custody?*, 39 S.D. L.Rev. 687 (1994).

26. The agents learned that Evans would be home alone on September 19, 1990, when Agent Hedlund and Officer Parker interviewed Evans and his family the day before, September 18, 1990. *See supra* note 4 and accompanying text.

Hedlund terminated. However, neither Hedlund nor Mower was involved in the arrest decision, both officers had earlier told Evans that he was not under arrest, the timing of the end of the interrogation with the arrest appears to have been coincidental, and the decision to obtain the arrest warrant did not depend on any information gathered from the September 19, 1990, interview. Therefore, the arrest is not relevant to whether Evans felt that "arrest was imminent." *Griffin,* 922 F.2d at 1355. This factor, therefore, does not favor a finding of custody.

To summarize, one of the three mitigating factors was met and one of the three coercive factors was satisfied. Five in-home custody cases in the Eighth Circuit are helpful in analyzing these results. In both *United States v. Helmel,* 769 F.2d 1306 (8th Cir.1985), and *United States v. Jones,* 630 F.2d 613 (8th Cir.1980), the Court found all three mitigating factors satisfied and all of the coercive factors absent. In both cases the Court did not find custody.

In the next three cases, the Court found custody. In both *United States v. Griffin,* 922 F.2d 1343 (8th Cir.1990), and *United States v. Carter,* 884 F.2d 368 (8th Cir. 1989), none of the mitigating factors were met but two of the three coercive factors were satisfied. In *South Dakota v. Long,* 465 F.2d 65 (8th Cir.1972), the Court found that evidence concerning one of the mitigating factors and one of the coercive factors was so strong as to outweigh the mitigating effect of the *Miranda*-type warnings given to the defendant.

In the instant case, the absence of the second and third factors, the satisfaction of the fifth factor, and the overall evidence strongly favor custody. Therefore, this Court finds that Evans was in custody on September 19, 1990, when Mower and Hedlund interrogated him.

 The Iowa District Court found that "the Defendant was not in custody nor was his freedom of movement restrained in any significant manner. The agents neither expressed any threats nor did they offer any show of force." *Evans,* No. CR401–1090, at *3. The District Court also concluded that the "Defendant was permitted complete freedom of movement during this time including use of the phone. During this time, the Defendant was permitted to and did eat, drink and use the bathroom. The Defendant also left the residence to go to the mailbox to get the mail." *Id.* at *5–6. The Iowa Supreme Court stressed that "throughout the interview, Evans continued his domestic activities, including watching television and preparing a meal. He even offered to fix lunch and iced tea for the officers." *Evans,* 495 N.W.2d at 763.

The Iowa courts' resolution of the freedom-of-movement factual issue was clearly contrary to the evidence, and therefore, was unreasonable. It is clear from Hedlund's own testimony that Evans was not permitted complete freedom of movement. Freedom of movement, especially in one's own home, at least entails the freedom from a government chaperone. To say Evans was permitted to eat, drink, use the bathroom, and check his mail, while omitting the chaperoning evidence, is a misrepresentation of the evidence and an unreasonable determination of a crucial custodial fact. Freedom of movement and freedom to do as one pleases is a material factor in custodial determinations, *State of Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) and the Iowa courts' failure to so acknowledge was critical.

The Iowa courts also concluded the agents did not engage in strong-arm tactics. They emphasized the fact that there was no evidence of coercion, threats, or show of force. The Iowa District Court even stated, "The officers were non-aggressive and polite throughout the interviews." *Evans,* No. CR401–1090, at *9. While the agents clearly did not engage in the egregious acts that the Iowa courts have emphasized, there is evidence of questionable tactics that the Iowa courts did not discuss. The absence of extreme

strong-arm tactics does not require a finding of noncustody. The Eighth Circuit has observed that outrageous forms of strong-arm tactics are not likely to be found since they have been strongly condemned. *See Griffin,* 922 F.2d at 1354. If this factor favored anything it should have favored custody. The Iowa courts' heavy reliance on this factor to support their conclusions of non-custody was unreasonable.

The Iowa courts also failed to find police domination. First, the Iowa Supreme Court depended heavily on the fact that the interview occurred at Evans's home. *Evans,* 495 N.W.2d at 764. In addition to stressing the domestic activities engaged in by Evans, the Court also stated that "[i]t could be said, in fact, that the interview was under circumstances too relaxing and informal to be effective; at one point, the officers could not divert Evans' attention from television long enough to talk to him until one of them moved his chair to block the television." *Id.* The District Court emphasized that "[t]he Defendant was never told that he was not free to leave, nor were any words said which would imply that he could not leave. There were only, at most, two officers present, and there is no suggestion that they displayed weapons. The officers were non-aggressive and polite through the interviews." *Evans,* No. CR401–1090, at *9.

While the District Court exhausts the list of actions in which the agents did *not* engage, it failed to consider the many actions the agents *did* undertake. Also, the Iowa Supreme Court's conclusion about the "block the television" evidence was misplaced. The evidence leads to the opposite conclusion; Evans was not free to do as he pleased, not even free to watch television when he wanted. The fact that the agents' actions occurred in Evans's home probably intensified the effect on Evans. *See Griffin,* 922 F.2d at 1355 n. 15. The evidence shows clearly and convincingly that there was police domination, and the Iowa courts' opposite conclusions and heavy reliance on those conclusions were unreasonable.

In conclusion, the Iowa District Court's determination of no custody was based on the facts that the interrogation occurred in Evans's house and the agents did not engage in the coercive, aggressive or threatening behavior discussed in *Miranda. See Evans,* No. CR401–1090, at *9. The Iowa Supreme Court's decision was based on the facts that the interrogation occurred in Evans's home, there was no coercive, aggressive, or threatening behavior by the agents, and Evans continued to engage in normal domestic activities. *See Evans,* 495 N.W.2d at 762–63. Both opinions gave inappropriately short shrift to an issue that deserved and required careful scrutiny. As a result, the Iowa courts failed to address or consider relevant evidence and important factual issues. Additionally, some of their factual conclusions were clearly contrary to the relevant evidence. It is clear that these errors formed a significant basis for their decisions on the custody issue.

These errors cause this Court to view the Iowa courts' custody conclusions as unreliable. This unreliability, coupled with this Court's independent conclusion that Evans was in custody requires that the noncustodial findings should be reversed to conclude that Evans was in custody during the September 19, 1990, interview conducted by Hedlund and Mower.

### 2. Waiver

 The next substantive issue is whether Evans waived his *Miranda* rights when he reinitiated a conversation with Hedlund after invoking his right to remain silent. When a person asserts his right to remain silent and thereafter makes incriminating statements, the question is whether that person's right to remain silent was "scrupulously honored." *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). However, in the present case, Evans did reinitiate a conversation with Hedlund, so it is proper to determine the narrow question of whether this reinitiation constituted a valid waiver.

In *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), the Supreme Court stated that after a defendant asserts his right to silence or right to counsel, a "defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may [ ] support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." *Id.* at 373, 99 S.Ct. 1755. A court should consider " 'the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused' " in resolving the waiver issue. *Id.* at 374–75, 99 S.Ct. 1755 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)).

There is one important fact that the Iowa courts did not discuss in their waiver analysis; after Evans reinitiated the conversation with Hedlund, he only discussed personal matters, such as Hedlund's family and job.[27] Also, there is no evidence in the record indicating Evans had previously been interrogated by police or that he was otherwise familiar with interrogation situations. Finally, Evans was physically disabled and mentally impaired, although the extent of his deficiency was not fully resolved.

It is undisputed that Evans reinitiated the conversation with Hedlund by asking if he could ask Hedlund some questions. And while it is true that immediately after this question Hedlund may have reasonably believed that Evans wanted to talk about the investigation. Evans's actual questions demonstrate that he did not want to talk about the investigation. Evans limited his conversation to Hedlund's personal life, and avoided any discussion about the investigation. This should have indicated to Hedlund that Evans did not want to talk about the investigation but merely wanted to engage in innocent banter. The context of Evans's reinitiation supports this conclusion. Hedlund remained in the house and nothing was said for almost thirty minutes. It is not unreasonable to believe, in fact it would be unreasonable not to believe, that any person in Evans's situation would want to "break the silence." This is not a case described by *Butler* where waiver can clearly be inferred by the defendant's conduct; in fact, in this case the opposite is true. Nonwaiver can clearly be inferred from Evans's conduct. Also, this case does not even remotely resemble Eighth Circuit cases where waiver has been found. *See United States v. White*, 750 F.2d 726 (8th Cir.1984); *United States v. Voice*, 627 F.2d 138 (8th Cir.1980); *United States v. Zamarripa*, 544 F.2d 978 (8th Cir.1976). The State had a heavy burden to show waiver and the evidence after reinitiation does not come close to meeting that burden.

The Iowa Supreme Court addressed the waiver issue in a single sentence: "Even if *Miranda* did apply, our de novo review causes us to conclude, as did the district court, that Evans freely and voluntarily waived those rights." *Evans*, 495 N.W.2d at 764. The District Court stated that Evans's

> questions and his actions in this case demonstrate a willingness to have a generalized discussion with the agent. The inquiry and conversation initiated by the Defendant was not incidental to a custodial environment. Hedlund could reasonably interpret the conversation as generally relating to the death of Delia Forbes. This is apparent from the fact that Hedlund immediately reminded the Defendant of his '*Miranda* rights' as reflected in Hedlund's testimony as well as that of the defendant.

*Evans*, No. CR401–1090, at *15–16. The District Court also concluded that "the Court has resolved this [waiver] matter in prior portions of these 'Conclusions of Law' in favor of the State." *Evans*, No.

**27.** Hedlund, SH, p. 13 ll. 20–24; Hedlund, Trial, p. 402 ll. 16–20; p. 404 ll. 7–10.

CR401–1090, at *16. The District Court interpreted Evans's reinitiation of the conversation with Hedlund in light of its analysis of Evans's initial waiver when the agents first arrived.

■ As previously discussed, the facts show that Evans did not want a generalized discussion about the investigation. The District Court's opposite conclusion was clearly contrary to the evidence. This error stems from the fact that the District Court did not address the evidence about the actual questions asked by Evans. Likewise, its reliance on Evans's waiver before the initial interview is misplaced. The waiver around 11:30 A.M., when the initial interview began, cannot serve as the basis for the conclusion that Evans waived his rights at 1:00 P.M., after he had invoked his right to remain silent at 12:22 P.M.

Another basis that possibly was used by the Iowa Supreme Court to support its conclusion is its finding that Hedlund told Evans he had to waive his *Miranda* rights before any conversation could take place. However, this conclusion is not supported by the record, and in fact, the evidence is clear and convincing that such a statement was not made. Importantly, the District Court did not find that Hedlund made the waiver statement. *See Evans*, No. CR401–1090, at *5. On direct examination at the suppression hearing, Hedlund testified to his response to Evans's question of whether he could ask Hedlund some questions.

I explained to Jack that we had initially read him his *Miranda* rights, that we had talked for a while, and that at that point he stated he didn't want to talk anymore. I told him it was impossible for me now to try to renew the conversation, but if wanted [sic] to talk that I was willing to talk and listen to him and answer any questions he had. I asked him if he understood that.

Hedlund, SH, p. 13 ll. 11–17. On cross examination, Hedlund was asked, "And when you talk about the second time, your indication was to him, 'You've been advised of your rights,'" to which Hedlund answered, "That's correct." *Id.* at p. 23 ll. 23–25, p. 24 line 1. At trial, Hedlund again testified to his response to Evans's question.

I explained to him that we had previously advised him of his *Miranda* rights and that we had done an interview with him and asked him several questions and that he had indicated he didn't want to answer any more questions, and that I could not now start a new conversation with him unless it was his own choice.

Hedlund, Trial, p. 402 ll. 6–11.

The only evidence to support the Iowa Supreme Court's conclusion is Evans's own testimony at the suppression hearing. Evans was asked, "And isn't it a fact that he informed you that the only way he could start another conversation with you was if, in fact, you further waived those rights," to which Evans said, "Yes, probably." Evans, SH, p. 73 ll. 7–10. Later he was asked, "And after he indicated that he would only have that further conversation with you if you, in fact, waived those rights further; is that right," and he answered, "Probably. I can't recollect right now." *Id.* at p. 74, ll. 4–7. The District Court discredited this testimony in resolving a factual dispute about whether Evans had requested an attorney in addition to invoking his right to remain silent. *See Evans*, No. CR401–1090, at *18. If the Supreme Court relied on this evidence, such reliance on indecisive answers to leading questions on cross examination by one not trained in the importance of legal "buzz words" is misplaced. Furthermore, it is clear that the District Court found Hedlund's testimony credible, especially since much of it was contained in his written reports. Surely, if Hedlund had told Evans that he must waive his *Miranda* rights before another conversation could occur he would have testified to that important fact. A trained agent would most likely remember making such a statement or at least would have noted it in a report since it could become crucial evidence to a waiver issue.

Based on the foregoing, the Iowa Supreme Court's finding that Hedlund made the waiver statement was clearly contrary to the evidence, and therefore, unreasonable. And even if such a statement were made by Hedlund, the subsequent evidence strongly shows that no waiver was intended by Evans.

The Iowa courts' findings of waiver were based on findings that Evans waived his rights and that his reinitiation showed a desire to have a generalized discussion about the investigation. These findings were based on unreasonable determinations of facts. Also both courts, especially the Iowa Supreme Court, gave cursory treatment to the waiver issue and its related evidence. These errors make the Iowa courts' decisions extremely unreliable. As a result, this Court's contrary conclusion that Evans did not waive his *Miranda* rights should prevail. Thus, the findings of waiver should be reversed to conclude that Evans did not waive his *Miranda* rights when he reinitiated the conversation with Hedlund.

### 3. "Scrupulously Honored"

Before exploring the law on this issue, it must be mentioned that the Iowa courts did not address this issue. Rather, they relied on their conclusions that Evans was not in custody, and alternatively, that he waived his *Miranda* rights. Since these conclusions were in error, this Court must analyze the "scrupulously honored" issue to dispose of this petition.

■■■■ The issues of waiver and "scrupulously honored" often overlap. *See Stumes v. Solem,* 752 F.2d 317, 321 (8th Cir.1985) ("In *Michigan v. Mosley,* the Court seems to have held that statements made subsequent to the exercise of the right to remain silent are admissible only if the police 'scrupulously honored' the defendant's right to silence. If they have not done so, subsequent waivers of rights are apparently not considered effective."). Because of this confusing relationship, it could be said that Evans's implicit confessions after invocation of his right to remain

silent evidence an intent to waive his rights. *See Zamarripa,* 544 F.2d at 981. However, that conclusion and reasoning would be erroneous. The situations where waiver can be inferred from a suspect answering questions are those where the suspect has not invoked his right to remain silent or right to counsel. *See id.* (finding waiver of *Miranda* rights where suspect was read his rights, refused to sign a waiver form, but proceeded to answer questions). Since Evans invoked his right to remain silent, and did not waive it by reinitiating the conversation with Hedlund, the proper question is whether Hedlund "scrupulously honored" Evans's right to remain silent. *See Stumes,* 752 F.2d at 321.

In *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Supreme Court set forth the rule in this context: "We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104. The Court cited various factors relevant to the analysis: (1) whether the officers ceased the interrogation immediately; (2) whether the officers tried to resume the questioning; (3) whether the officers tried to persuade the defendant to reconsider his position; (4) whether questioning resumed only after the passage of a significant period of time; (5) whether questioning resumed with the provision of a fresh set of warnings; (6) whether the defendant was given a full and fair opportunity to exercise his rights; (7) whether the defendant was questioned by another police officer; (8) whether the defendant was questioned at another location; or (9) whether the defendant was questioned about an unrelated crime. *See id.* at 104–06, 96 S.Ct. 321. The Eighth Circuit has focused on four of the *Mosley* factors as most important: (1) immediate cessation of initial interview; (2) resumption of questioning after passage of significant amount of time; (3) provision of fresh set of warn-

ings; and (4) restriction of second interrogation to crime that was not the subject matter of the earlier interrogation. *See United States v. Finch,* 557 F.2d 1234, 1236 (8th Cir.1977). The purpose of the *Mosley* analysis is to safeguard a defendant's right to cut off questioning and to require law enforcement authorities to respect a person's exercise of the option to counteract the coercive pressures of the custodial setting. *See Mosley,* 423 U.S. at 104, 96 S.Ct. 321. Thus, a defendant's right to cut off questioning assures him that "he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Id.* at 103–04, 96 S.Ct. 321.

In the following cases the Eighth Circuit found the defendant's rights had been scrupulously honored. In five cases, the Court found only the subject matter factor missing. *See Finch,* 557 F.2d at 1236; *Jackson v. Wyrick,* 730 F.2d 1177, 1180 (8th Cir.1984); *United States v. Udey,* 748 F.2d 1231, 1241–42 (8th Cir.1984); *Stumes,* 752 F.2d at 322 (interview number three); *United States v. House,* 939 F.2d 659. In another case, the Court found only the *Miranda* warning factor absent. *See Stumes,* 752 F.2d at 321 (interview number two). Finally, in two cases, the Court found all four factors present. *See Otey v. Grammer,* 859 F.2d 575, 579 (8th Cir. 1988); *United States v. McClinton,* 982 F.2d 278, 281–82 (8th Cir.1992).

It is clear that omission of one of the four emphasized *Mosley* factors does not necessarily make a subsequent confession inadmissible. Rather, overall evidence that a defendant was not pressured or badgered into waiving his right to remain silent will overcome deficiency in one of the *Mosley* factors.

■ In the instant case it is obvious that the last factor concerning subject matter was not met. Also, the first factor was not satisfied. Hedlund's own testimony shows that he did not provide Evans a fresh set of warnings when Evans reinitiated the conversation, but only advised him to keep his previously-read rights in mind. No warnings or advisements were given before Hedlund's redirection of the conversation to the murder investigation, which occurred about one and a half hours after Evans had reinitiated the conversation. The fact that Evans may have been, and probably was, aware of his rights does not obviate the need to provide a fresh set of warnings. "[T]he requirement of *Miranda* warnings is not contingent either upon a defendant's actual or presumed knowledge of his rights or on his status but, rather, must be honored in all instances of custodial interrogation." *United States v. Longbehn,* 850 F.2d 450, 453 (8th Cir.1988). In fact, in *Longbehn,* the defendant was a police officer and well aware of his rights, yet the Court held that his statements should be suppressed because he was not read his rights before custodial interrogation. *See id.* Since the purpose of the *Miranda* warnings, as made clear in *Mosley,* is to combat the inherently coercive pressures of the custodial setting, the fact that the warnings were not reread to Evans, especially before Hedlund redirected the conversation to the murder investigation, is a critical factor in support of a finding that Evans's right to remain silent was not scrupulously honored.

Also, when Evans attempted to engage Hedlund in social chit-chat, Hedlund redirected it to the murder investigation. The tactics used by Hedlund in redirecting the conversation to the murder investigation consisted of comments about the irony of Evans's question whether Hedlund had ever been shot at in the line of duty, telling a disabled Evans that he should be a man and take responsibility for his actions, and questions where Evans's guilt was laid out as a fact with the focus on why Evans committed the murder. *See Miranda,* 384 U.S. at 450, 86 S.Ct. 1602 (reciting that some of the coercive techniques used by interrogators included positing "the guilt of the subject ... as a fact. The interrogator should direct his comments toward the reasons why the subject committed the act, rather than court failure by asking the subject whether he did it."). These are

the kind of pressure tactics that *Miranda* and *Mosley* guard against.

The fact that Hedlund remained at Evans's house after invocation of the right to silence, and even chaperoned Evans throughout that time, is also important. The continued presence of Hedlund did not leave Evans free from the pressures of his interrogators to reconsider his decision. *Mosley* and the Eighth Circuit cases following it were premised on the fact that the defendant was left alone after his invocation "to reconsider his decision free of the pressure and influence of the questioning officials." *Stumes,* 752 F.2d at 322. In this case, Hedlund remained in Evans's house after invocation of the right to remain silent, and anywhere Evans went on his own premises. Hedlund was close behind. Also, after Evans' first implicit confession, he went outside because he was upset. However, Hedlund tailed right behind him and eventually obtained other incriminating statements. This is relevant evidence that shows Hedlund was intent on getting a confession, not on scrupulously honoring Evans' right to remain silent.

In conclusion, Evans's attempt to control the subject matter of the conversation was wrested away by Hedlund's presence and tactics, and more than one *Mosley* factor was absent. This, along with the overall circumstances that evidence coercive custodial pressures and efforts to persuade Evans to reconsider his position, shows that Hedlund did not scrupulously honor Evans's right to remain silent.

### V. Conclusion

Because of the findings on the custody, waiver, and "scrupulously honored" issues, this Court concludes admission at trial of the incriminating statements made by Evans after he invoked his right to remain silent was in violation of the Fifth Amendment of the United States Constitution. Those statements should have been suppressed and failure to do so was constitutional error.

### VI. Remedy

■ The constitutional error in admitting the statements was a trial error and therefore subject to harmless error review. *See Arizona v. Fulminante,* 499 U.S. 279, 306–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Brecht v. Abrahamson,* 507 U.S. 619, 629–30, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Atley v. Ault,* 191 F.3d 865, 873 (8th Cir.1999). There are two harmless error analyses to choose from. One is the *Chapman* analysis, used "if the state courts had the opportunity to address the constitutional error under the *Chapman* standard but did not do so because they found that there was no error." *Starr v. Lockhart,* 23 F.3d 1280, 1292 (8th Cir.1994). The other is the *Brecht* analysis, used if the state court, on direct review, analyzed the constitutional error under *Chapman. See Richardson v. Bowersox,* 188 F.3d 973, 978–79 (8th Cir.1999). Because the Iowa courts did not find a constitutional error, they did not review the error under the *Chapman* standard; therefore, the *Chapman* analysis is proper here.

■ In *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court stated that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." In explaining its rule, the Court compared an earlier statement it had made in *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), which said that "the question is whether there is a reasonable probability that the evidence complained of might have contributed to the conviction," with the common law harmless error rule that "put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment." *Chapman,* 386 U.S. at 24, 87 S.Ct. 824. The Court said there was little difference between the two tests and therefore adhered to both when explaining its test. *See id.*

While the *Chapman* test is set in familiar terminology, it is so general as to afford little guidance. However, in *Chap-*

*man*, the Court did say it was improper to overemphasize the court's view of "overwhelming evidence." *See id.* at 23, 87 S.Ct. 824. *Cf. Williams v. Clarke*, 40 F.3d 1529, 1541 (8th Cir.1994) (stating that the proper question is "whether what was actually and properly considered in the decision-making process was 'so overwhelming' that the decision would have been the same even absent the invalid factor"). In a case involving the more deferential *Brecht* test, the Supreme Court stated that if a judge has "grave doubt" about whether an error affected the jury, the judge must treat the error as if it did and the petitioner must win. *See O'Neal v. McAninch*, 513 U.S. 432, 438, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). By grave doubt, the Court meant "the matter is so evenly balanced that [the judge] feels himself in virtual equipoise as to the harmlessness of the error."

A review of the evidence presented at trial leads to the conclusion that admission of the statements was not harmless beyond a reasonable doubt. There was other incriminating evidence, such as Evans's lack of an alibi at the time of Forbes's death and identification of his .357 magnum as the murder weapon. However, there was disputed evidence that at least questioned Evans's guilt. There was a dispute concerning Dr. Bennett's calculation of Forbes's time of death, disagreement whether Forbes was seen alive after the time-of-death date, argument about the significance of Dr. Poole's rigor mortis evaluation the day Forbes's body was found, and the fact that Evans was not the only person who had access to his .357

magnum. In addition, nothing obtained in the search of the Evans' residence was received into evidence. Evans's incriminating statements easily could have, and probably did, taint some of the disputed evidence presented, and easily could have caused the jury to settle those disputes against him. In addition, his statements quite possibly had a greater effect on the jury due to the limited direct evidence against him. It is not possible to say that the incriminating statements were harmless beyond a reasonable doubt nor that the inculpatory evidence was so overwhelming that the result would have been the same without the statements. Even under the more deferential *Brecht* standard, the Court would have grave doubts about the harmlessness of the statements. Because the error was not harmless, the writ of habeas corpus will be granted.[28]

## VII. Rulings and Order

On September 19, 1990, Evans was **IN CUSTODY,** he **DID NOT WAIVE** his *Miranda* rights after invoking his right to remain silent, and Agent Hedlund **DID NOT SCRUPULOUSLY HONOR** his right to remain silent. The Iowa courts' decisions to the contrary were **BASED ON AN UNREASONABLE DETERMINATION** of the facts in light of the evidence presented at the suppression hearing and trial, and therefore those decisions were **ERRONEOUS.** Admission of Evans's incriminating statements made after invoking his right to remain silent was **CONSTITUTIONAL ERROR,** and was **NOT HARMLESS.** Therefore, Evans's petition for writ of habeas corpus is

---

28. This Court notes the inherent difficulty of granting a writ of habeas corpus, even at the District Court level, for a defendant convicted of murder. But as Judge Richard Arnold has eloquently observed:

If [a defendant] is indeed guilty, and if he goes free as a result of our holding, then complete justice may not have been done .... A system of law that not only makes certain conduct criminal, but also lays down rules for the conduct of the authorities, often becomes complex in its application to individual cases, and will from time to time produce imperfect results, especial-

ly if one's attention is confined to the particular case at bar. Some criminals do go free because of the necessity of keeping government and its servants in their place. That is one of the costs of having and enforcing a Bill of Rights. This country is built on the assumption that the cost is worth paying, and that in the long run we are all both freer and safer if the Constitution is strictly enforced.

*Williams v. Nix*, 700 F.2d 1164, 1173 (8th Cir.1983), *rev'd on other grounds*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

**GRANTED,** and it is **ORDERED** that the writ will issue unless, within **90 DAYS** from the date of this opinion, the State of Iowa has commenced proceedings to retry Evans.